# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50361 | **DATE** | 8/27/2003 |
| **CASE TITLE** | | Lugo vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)    ☐ General Rule 21    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | AUG 28 2003 | | 15 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 8/26/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| sp | courtroom deputy's initials | | sp | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| RUBEN LUGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 50361 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Ruben Lugo ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income ("SSI") and Disabled Adult Child's Insurance Benefits ("CIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1614(a)(3). This matter is before the Magistrate Judge pursuant to consents filed by both parties on January 27, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### I.   BACKGROUND

Plaintiff filed for SSI and CIB on May 16, 2000, alleging disability on May 2, 2000 and May 30, 1980, respectively. (Tr. 224-226 and 80). Plaintiff's application for benefits was denied on August 11, 2000. (Tr. 12 and 228). On September 13, 2000, Plaintiff filed a request for reconsideration. (Tr. 233). Plaintiff's request for reconsideration was denied on November 6, 2000. (*Id*.). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on

January 5, 2001. (Tr. 21A). Plaintiff appeared, with counsel, before an ALJ on February 13, 2002. (Tr. 243). In a decision dated March 29, 2002, the ALJ found that Plaintiff was not entitled to SSI or CIB. (Tr. 79). On May 21, 2002, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 8). On July 19, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 6).

## II.    **FACTS**

Plaintiff was born on April 29, 1963 and was thirty-eight years old at the time of his February 13, 2002 hearing before the ALJ. (Tr. 252). Plaintiff, who was enrolled in a special education program, did not complete high school. (*Id*.). At the time of the hearing, Plaintiff lived with his mother and stepfather. (Tr. 264). Plaintiff is a diabetic and is required to take medication daily to control his blood sugar level. (Tr. 258).

While Plaintiff was in high school, Plaintiff worked as a janitor at a junior high school. (Tr. 252). Apparently, as part of his special education program, Plaintiff was employed at the junior high school. However, because the job was part of the program, when Plaintiff dropped out of the program his job as a janitor at the junior high was terminated. (Tr. 253).

After Plaintiff dropped out of high school, his first full time job, which lasted two months, was with JA Associates, a landscaping company. (*Id*.). At JA Associates, Plaintiff's duties including general landscaping responsibilities and cutting and trimming lawns.[1] (Tr. 254). Plaintiff testified that he quit his job at JA Associates because they implemented drug testing for their

---

[1] Plaintiff also testified that he could occasionally fix the lawnmower if it broke down. For example, Plaintiff stated that he could remove and clean the spark plug and then put it back in. (Tr. 262).

2

employees and he "walked out."[2] (*Id.*). Although the exact dates and duration of his employment at JA Associates is unknown, Plaintiff quit and subsequently worked for Blue Freedom Market. Plaintiff testified that his job at Blue Freedom Market required him to "get rid of old fruit, ... ." (*Id.*). Plaintiff was fired from Blue Freedom Market because "some people got in trouble, and [Plaintiff] didn't stick up for the people so they fired [him]." (*Id.*). Plaintiff worked for Blue Freedom Market for "close to two weeks." (Tr. 260).

After Blue Freedom Market, Plaintiff worked for Happy Temps, a temporary work service. (Tr. 255). One of Plaintiff's jobs was in Dixon, Illinois where he picked up paper, branches and other things in a landfill. (*Id.*). Plaintiff left his landfill job in Dixon after only a couple of weeks because "[s]ome guy got killed there - - a machine fell on him - - and the main boss ... said we couldn't take temps because we didn't have safety equipment ... ." (*Id.*). After working in the Dixon landfill, Plaintiff worked for Gulrab Farms in October 1997. Plaintiff's employment at the farm was seasonal. When asked what he did at Gulrab Farms, Plaintiff responded "gathering up turkeys and hanging them." Plaintiff allegedly quit his job at Gulrab Farm because the owner died. (*Id.*). That was the last "regular" job Plaintiff had. Since his job at Gulrab Farm, Plaintiff stated that now he just collects cans or performs odd jobs. (*Id.*).

Plaintiff stated that the reason he was unable to attain any jobs after Gulrab Farms was because he was unable to fill out the job applications. (Tr. 256). When asked to explain in further detail, Plaintiff stated "I couldn't fill them all the way out, you know, ... Because it's too difficult. They asked questions I couldn't fill out, you know, like the last time - - how many jobs. I couldn't

---

[2] Plaintiff later testified that he would use "weed" approximately every two weeks but never used cocaine, heroin, crystal meth, or speed. (Tr. 261).

write the - - I couldn't spell the names of them and everything like that." (*Id.*). Apparently, Plaintiff cannot read newspapers, books, and warning labels but Plaintiff did state that it usually depends on how long the words are as to whether he can read them. Plaintiff has trouble adding and subtracting and although Plaintiff stated he is able to give money and receive change when purchasing items, Plaintiff did state that he does not count the change because he usually just puts it in his pocket. (*Id.*).

A typical day for Plaintiff consists of waking up around nine in the morning and going to visit friends. (Tr. 257). Plaintiff testified that he is "in and out" of his house throughout the day. Plaintiff usually returns home around noon to eat lunch and, in the summer, do some yard work to prevent the lawn from "being bad." (*Id.*). Additionally, Plaintiff helps out around the house by doing some lawn work, giving his mother money to help pay bills, doing his own laundry, sweeping and mopping the floor, and vacuuming. (Tr. 264).

When asked why Plaintiff did not think he could work, Plaintiff responded "Well, there's probably certain things I can't do or certain jobs. They have you probably do measurements or stuff like that, you know, and write it down and say, you know, I need this size of piece of board or something, I can't do it, ... ." (Tr. 259).

Medical expert, Dr. Joseph Cools, appeared before the ALJ on February 13, 2002. (Tr. 247). Dr. Cools testified that while Plaintiff does have a cognitive disorder, Plaintiff does not meet or equal the requirement of Section 12.05. (Tr. 247). Specifically, Dr. Cools stated that Plaintiff's verbal IQ of 61, performance IQ of 86 and full scale score IQ of 70 is somewhat extraordinary and not indicative of metal retardation. (Tr. 248). While the listing only requires one IQ below 70 (which Plaintiff satisfies), Dr. Cools stated that the listing also requires that Plaintiff is functioning

4

in a mentally retarded range (i.e. activities of daily living, socializing, etc), and that is where, in Dr. Cools opinion, Plaintiff falls out of "listing level severity." (*Id.*). In Dr. Cools opinion, the discrepancy between Plaintiff's three IQ tests shows that Plaintiff has a learning disorder and is not mentally retarded. (Tr. 251). Even though Plaintiff's verbal IQ is in the mentally retarded range, Plaintiff's functional ability is higher than that of a mentally retarded individual. Dr. Cools testified that he based this opinion on Plaintiff's past history, his activities, his way of relating, and his ability to function in the environment. (Tr. 249).

When asked by the ALJ, Dr. Cools stated that Plaintiff's limitations include the inability to learn material that is either written or spoken. (Tr. 266). According to Dr. Cools, Plaintiff has difficulty in not only receiving information from other people in a verbal or written manner but he also has difficulty in expressing himself. Plaintiff is not extremely articulate but is able to express himself given enough time and patience from the listener. However, Plaintiff's limitations do not include the inability to watch somebody do a certain task and then by able to do it himself. Plaintiff learns by example. (*Id.*). Lastly, Dr. Cools testified that Plaintiff cannot perform complex tasks or perform tasks that require interaction with the public or that require Plaintiff to receive written or verbal orders from another individual. (Tr. 267).

Vocational expert, Cheryl Hoiseth, appeared before the ALJ on February 13, 2002. (*Id.*). The ALJ directed Ms. Hoiseth to assume a person of Plaintiffs age, which ranged from seventeen to thirty-eight during the relevant period, with an eleventh grade special education, no past relevant work experience, who is unlimited exertionally but cannot perform work that requires complex or detailed tasks or work with the public. After presenting the above hypothetical, the ALJ asked Ms. Hoiseth whether there was any work that such an individual could perform. Mr. Hoiseth stated, that

based on the above, such a person could be an assembler (30,000 jobs in the Chicago metropolitan area), a vehicle washer (9,000 jobs in the Chicago metropolitan area) and a hand packer (approximately 15, 000 jobs in the Chicago metropolitan area). When asked further by the ALJ to assume the individual could not perform any work that requires extensive verbal or written communication, Ms. Hoiseth stated that such limitations would not effect the assembler or hand packer jobs because they are normally jobs taught by demonstration. (Tr. 268-69). Additionally, Ms. Hoiseth stated that the above mentioned jobs would not be limited by an individual would could not read or write.

### III. **MEDICAL HISTORY**

The earliest medical report available to this Court is dated October 7, 1993. However, this report does not deal with Plaintiff's mental condition or diabetes; rather, the report deals with Plaintiff's left knee. On the October date, Plaintiff saw Dr. Edward S. Magnus of the CGH Medical Center in Sterling, Illinois. (Tr. 147). Dr. Magnus stated that AP and lateral projections reveal no evidence of fracture or dislocation. (*Id.*). Plaintiff's joint space was normal and there was no degenerative change detected. (*Id.*). Dr. Magnus did note, however, that Plaintiff probably had a joint effusion. (*Id.*).

The next medical report available to this Court, again not directly addressing Plaintiff's mental condition or diabetes, is in regards to a right wrist and hand injury Plaintiff received after he fell off his bike. (Tr. 144). Dr. Valentino Menis of the CGH Medical Center's Emergency Department reported that Plaintiff stated he fell off his bicycle and "a car then ran over his right forearm." (*Id.*). Dr. Menis reported Plaintiff "is obviously inebriated with a strong odor of "etoh" on the breath and [ ] admits to having had five or six beers." (*Id.*). The circumstances of Plaintiff's

6

injury get stranger where the record indicates a police officer was notified about Plaintiff's injury and the police officer notified saw Plaintiff fall off his bike and hit a curb. The officer stated Plaintiff did not get hit by a car. (*Id.*). Dr. Menis' physical examination revealed Plaintiff had a superficial abrasion on his dorsal aspect of the little finger on his right hand. (*Id.*). Additionally, Plaintiff had tenderness diffusely about the right wrist. (*Id.*). Ultimately, Dr. Menis fitted Plaintiff with a fiberglass splint encompassing Plaintiff's thumb. (*Id.*).

The first medical report available to this Court dealing directly with Plaintiff's mental ability and/or his diabetes is dated April 27, 2000. (Tr. 141). On that date Plaintiff saw Nurse Jean Pastorello of the CGH Medical Center. (*Id.*). Nurse Pastorello provided Plaintiff, a new diabetic at the time, with information regarding diabetes. (*Id.*). Specifically, Nurse Pastorello indicated that she provided information on nutritional management, exercise and activity, self-monitoring, and health and community resources. However, Nurse Pastorello also reported that "[t]eaching was modified due to patient's learning difficulty as reported by the patient and mother. Basic information was difficult for patient to remember." (*Id.*). Nurse Pastorello recommended that Plaintiff keep a three-day food record for this dietitian, take blood sugars, decrease fat, sugar and alcohol, and exercise. (*Id.*).

Plaintiff saw Nurse Pastorello again on May 4, 2000. (Tr. 140). Nurse Patorello reported that Plaintiff's blood sugar at the time of the visit was 265 and that Plaintiff's blood sugar ranged from 200 to 285. (*Id.*). Also of note, Nurse Pastorello reported that Plaintiff "performed the demonstration of using the [diabetes] monitor correctly." (*Id.*). Nurse Pastorello's report indicated that Plaintiff's next appointment was four days later with the dietitian, but no such report is present before this Court. On May 25, 2000, Plaintiff filled out an Activities of Daily Living Questionnaire

provided by the Bureau of Disability Determination Services. (Tr. 102). Under Living Arrangements, Plaintiff indicated that he lives at home with his parents and that his mother cooks for him. (*Id.*). Plaintiff also indicated that he assists with cleaning, vacuuming, laundry, repairs, and yard work at least two times per week. (*Id.*). In terms of Personal Care, Plaintiff indicated that he was taking Zestril once in the morning, Avandia once in the morning, Toprol once in the evening, and Glucophage once in the evening. (Tr. 103). In terms of Plaintiff's Activities and Interest, Plaintiff indicated that he leaves home everyday to visit family, friends, run errands, and go fishing. (Tr. 104). Plaintiff often fixes things and talks to neighbors. (Tr. 105). Plaintiff sometimes reads, watches t.v., volunteers, pays bills, goes out to eat, goes out to a movie, and/or goes to school. Plaintiff indicated that he rarely or never drives, watches children ("not able to continue this activity"), plays cards or games, goes to sporting events, goes to church or talks on the phone. (Tr. 105).

On June 13, 2000, Dr. Jimenez reviewed Plaintiff's medical record and assessed Plaintiff's residual functional capacity. (Tr. 156-163). Dr. Jimenez reported that Plaintiff can occasionally lift and/or carry fifty pounds and can frequently lift and/or carry twenty five pounds. (Tr. 157). Additionally, Dr. Jimenez indicated Plaintiff can stand and/or walk about six hours in an eight hour day, sit for a total of six hours in an eight hour day, push and/or pull an unlimited amount, and never climb a ladder, rope or scaffold. (*Id.*). Dr. Jimenez noted no communicative limitations and that Plaintiff's only environmental limitation was that Plaintiff should avoid concentrated exposure of hazards such as machinery and heights. (Tr. 160). On June 13, 2000, Dr. Young-Ja Kim affirmed Dr. Jimenez's assessment of Plaintiff's physical limitations. (Tr. 155).

Robert Kuba, Clinical Psychologist for Norcare, observed and administered psychological

tests on Plaintiff on July 12, 2000. (Tr. 177-178A). Plaintiff's Wechsler Adult Intelligence Scale – III indicated a Verbal IQ of 61, a Performance IQ of 86 and a Full Scale IQ of 70. (Tr. 178). Plaintiff's Verbal Comprehension Index was 65, his Perceptual Organization Index was 89, and his Working Memory Index was 57. (*Id.*). The test also indicated Plaintiff's work recognition level to be below the third grade level. (Tr. 178A). Mr. Kuba reported that Plaintiff's responses to the problem solving tasks revealed a mildly mentally retarded level of verbal problem solving ability but low average to borderline ability when the tasks presented utilized visual and manipulative materials. (*Id.*). Mr. Kuba also reported that "[t]he indicated 25 IQ point discrepancy between the two scales is very unlikely due to chance alone and represents a clear relative superiority in [Plaintiff's] ability to learn through visual channels when compared to [Plaintiff's] ability to learn language related tasks." (*Id.*). Ultimately, Mr. Kuba reported that Plaintiff's responses clearly indicate a diagnosis of Mixed Receptive-Expressive Language Disorder and possibly Dysthymic Disorder. (*Id.*).

Tyrone Hollerauer, Psy. D., reviewed Plaintiff's medical history and records and determined that Plaintiff suffers from Organic Mental Disorders (§ 12.02) and Substance Addiction Disorders (§ 12.09). (Tr. 164). However, Dr. Hollerauer did not indicate Plaintiff suffers from Mental Retardation. Dr. Hollerauer reported that Plaintiff's disorders moderately affect his activities of daily living and cause moderate difficulty in his ability to maintain social functioning. (Tr. 171). Dr. Hollerauer also indicated that Plaintiff seldom has difficulties in concentration, persistence or pace and never has episodes of deterioration or decompensation in work or work-like settings. (*Id.*).

On October 24, 2000, Bronwyn Rains, MA, NCSP, LCPC, reviewed Plaintiff's medical records and reported Plaintiff suffers from an Organic Mental Disorder (§ 12.02), namely a learning disability. (Tr. 187). Mysteriously, Ms. Rains did not discuss whether Plaintiff suffered from

9

Mental Retardation (§ 12.05) even after acknowledging Plaintiff's low IQ scores. Ms. Rains reported that Plaintiff's learning disability moderately restricts his activities of daily living and causes moderate difficulty in Plaintiff's ability to maintain social functioning. (Tr. 197). Ms. Rains also indicated that Plaintiff is only mildly limited in his difficulties in maintaining concentration, persistence or pace. (*Id.*). Dr. Charles Harris affirmed Ms. Rains assessment on October 24, 2000. (Tr. 187).

## IV.  STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of

disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[3] The Commissioner sequentially

---

[3]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are

determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[4] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III,

---

identical to Part 404.

[4]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age,

education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on March 29, 2002. (Tr. 75). Specifically, the ALJ found that while Plaintiff has performed various odd jobs all lasting two months or less, "these work efforts can be disregarded as unsuccessful work attempts." (*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from a learning disability with receptive and expressive delays and diabetes mellitus. (Tr. 75). Additionally, the ALJ found that Plaintiff did not suffer from mental retardation even though one consultative examiner diagnosed Plaintiff with mental retardation based on Plaintiff's IQ score.[5] In dismissing the examiner's findings, the ALJ stated "there are no deficits in adaptive functioning, which are necessary for a finding of mental retardation." (*Id.*). In support of this statement, the ALJ relied on medical expert Dr. Cools who found that while Plaintiff had one IQ score below 70, the Plaintiff's functional abilities are above a mentally retarded level based on Plaintiff's way of relating, his past history, and his ability to function. (*Id.*). Given this, the ALJ found that the "evidence shows that the [Plaintiff] has been able to be independent in activities of daily living and maintain grooming. Thus, mental retardation is not [sic] medically determinable impairment." (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. However, exactly what severe impairments Plaintiff suffers from is challenged by the Plaintiff. This Court will nonetheless affirm ALJ's finding as to Step Two of the Analysis and proceed to Step Three for a more thorough discussion.

---

[5] However, this finding by the ALJ appears incorrect. While Dr. Kuba stated Plaintiff's scores on the problem solving tasks "reveal a mildly retarded level of verbal problem solving ability[,]" Dr. Kuba ultimately determined that Plaintiff was low average to borderline ability when confronted with visual and manipulative tasks, and as such, Plaintiff probably suffered from Mixed Receptive-Expressive Language Disorder and not mental retardation. (Tr. 178A).

C.      Step Three:  Does claimant's impairment meet or medically equal an impairment

in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments

do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4.  (*Id.*).

The ALJ found that, as noted above, the record does not support a finding of mental retardation.

Further, the ALJ found, that with respect to Plaintiff's diabetes, the medical evidence shows that

Plaintiff has a good control when Plaintiff "is not indiscreet in his diet and takes his medication."

(*Id.*).

Plaintiff's only argument against the ALJ's decision is that Plaintiff should have been found

disabled under § 12.05(C).  Section 12.05 provides that "Mental retardation refers to significantly

subaverage general intellectual functioning with deficits in adaptive functioning ... ."  20 C.F.R. Pt.

404, Subpt. P, App. 1 § 12.05.  The required levels of severity are met under § 12.05 when the

requirements of §§ 12.05(A), (B), (C), or (D) are satisfied.  Section 12.05(C) is the only section at

issue before this Court.  Section 12.05(C) provides that an individual is disabled where he/she has

"A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental

impairment imposing an additional and significant work-related limitation of function."  20 C.F.R.

Pt. 404, Subpt. P, App. 1 § 12.05(C). Thus, the issue is whether Plaintiff satisfies § 12.05(C).

The Seventh Circuit applies a two-part test in construing mental retardation claims.  That

being, "a claimant is considered disabled due to mental retardation when he has a valid verbal,

performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing

additional and significant work-related limitation of function." *Maggard v. Apfel*, 167 F.3d 376, 380

(7th Cir. 1999); *see also Fisher v. Bowen*, 869 F.2d 1055, 1055 (7th Cir. 1989)(stating that an

16

individual with an IQ between 60 and 69 and an additional and significant limitation of function is deemed to be totally disabled).

In this case, Plaintiff had a verbal IQ of 61, a full scale IQ of 70, and a performance IQ of 86. Plaintiff's verbal IQ of 61 falls within §12.05(C)'s requirement. Plaintiff appears to satisfy the first part of the two-part test.

The second part of the two-part test requires that Plaintiff suffers from a physical or other mental impairment imposing additional and significant work-related limitation of function. The term "additional and significant limitation of function" has been determined to mean "another distinct diagnosable impairment[.]" *Hall v. Apfel*, 122 F.Supp.2d 959, 967 (N.D. Ill. 2000). This other distinct diagnosable impairment could be a learning disability. A "significant limitation" does not have to be at the "marked" level, but only at the "moderate" level. *Id.*

Plaintiff recognizes that in order to be disabled under § 12.05(C) he must show that he suffers from another physical or mental impairment that imposes additional work-related limitation of function. Plaintiff attempts to do this be asserting that not only is he mentally retarded but that he also suffers from a learning disability. Specially, the Plaintiff argues that in addition to having a verbal IQ score of 61, which falls within the listing range, Plaintiff also has a "severe learning disability or disorder." (Pl.'s Mem. at Law at 3). Plaintiff's learning disability or disorder is a significant limitation, Plaintiff argues, because it "imposes work related limitations on Plaintiff's ability to learn new jobs by oral instructions or in writing or to follow any rules or learn of any company policies that are contained in any written manuals." (*Id.*). While this Court acknowledges that a learning disorder in addition to mental retardation could satisfy § 12.05(C), *see Hall*, 122 F. Supp.2d at 967 (stating that the Plaintiff has a learning disability, which is severe within the meaning

17

of the Social Security Act), this Court notes Dr. Cools and Mr. Kuba's assessment that Plaintiff is not mentally retarded as indicated by Plaintiff's IQ scores.

Two separate uncontradicted professionals, Dr. Cools and Mr. Kuba (Clinical Psychologist), both determined that Plaintiff was not mentally retarded but rather suffered from a learning disability. The opinions of Dr. Cools and Mr. Kuba are backed up by the record before this Court. Both point out that Plaintiff's verbal IQ score of 61 was in the mentally retarded range under § 12.05(C); however, Plaintiff's performance IQ of 89 was well above the range. In terms of Plaintiff's full scale IQ score of 70, Mr. Kuba wrote that the full scale IQ "represents the average of two such widely differing skill levels, it is believed to have a poor degree of predictive validity." (Tr. 178A). Additionally, the 25 IQ point discrepancy between the two scores, according to Mr. Kuba, represented a clear relative superiority in Plaintiff's ability to learn through visual channels when compared to Plaintiff's ability to learn a language related task. (*Id.*). Dr. Cools determined the same thing. (Tr. 251)("The defining characteristic is that [Plaintiff's] functional ability is higher than that of a mentally retarded individual.") Looking at this, it is apparent that Plaintiff can perform certain tasks if he is shown visually how to perform those tasks. This is evident through Plaintiff's ability to use his diabetes monitor correctly, perform landscaping duties such as cutting the grass and pulling weeds, and other tasks such as riding his bicycle to friends house, doing his own laundry, vacuuming, moping the floor, and cooking (baking or boiling chicken). All of these are activities that Plaintiff most probably learned through visual means.

Reluctantly, this Court finds that substantial evidence exists to support the ALJ's finding that Plaintiff does not suffer from an impairment that meets or medically equal an impairment in the Commissioner's listing of impairments and this Court finds no reason to disturb it. Therefore, the

18

ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff has no past relevant work and thus the burden is on the Commissioner to prove that there are other jobs existing in significant numbers in the national economy that Plaintiff can perform.  (Tr. 77).  The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding.  The ALJ's determination as to Step Four of the Analysis is affirmed.

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that there exist a significant number of jobs in the economy that Plaintiff can perform.  (Tr. 78).  Before reaching that conclusion, the ALJ determined Plaintiff's RFC limitation to be that Plaintiff "has an 11th grade education in special education but is illiterate. [Plaintiff] does not have any transferable skills. [Plaintiff] does not have an exertional limitations but has significant non-exertional limitations." (Tr. 77-78).  These limitations, according to the ALJ, include Plaintiff's inability to perform work that requires complex or detailed tasks or work with the public.  Based on this, the ALJ, after consulting with a vocational expert, determined that Plaintiff could perform work as an assembler, vehicle washer, and/or hand packager.  (Tr. 78).  These jobs, according to the vocational expert, can be performed without extensive verbal or written communication, are taught via demonstration, and do not require the individual to read or write.  (Tr. 268).

Substantial evidence exists to support the ALJ's finding and this Court finds no reason to

disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.    <u>CONCLUSION</u>

For the reasons stated above, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

**ENTER:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE:** 8/27/03